**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MARIA ANN EGAN,

     Plaintiff,

     vs.                              Civ. No. 18-592 KK

NANCY A. BERRYHILL, Acting Commissioner
of the Social Security Administration,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Maria Ann Egan's ("Ms. Egan") Motion to Reverse and Remand for a Rehearing with Supportive Memorandum (Doc. 19) ("Motion"), filed November 21, 2018, seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Commissioner") denying Ms. Egan's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on January 25, 2019, (Doc. 21), and Ms. Egan filed a reply in support of the Motion on February 7, 2019. (Doc. 23.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised, the Court FINDS that Ms. Egan's Motion is well taken and should be GRANTED.

## I. Legal Standards

### A. Standard of Review

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 8.)

This Court must affirm the Commissioner's final decision denying social security benefits unless: (1) "substantial evidence" does not support the decision; or, (2) the Administrative Law Judge ("ALJ") did not apply the correct legal standards in reaching the decision.[2]  42 U.S.C. §§ 405(g), 1383(c)(3); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.*  Although the Court may not re-weigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the [agency]'s findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the agency's] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  Thus, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the ALJ . . . must discuss the

---

[2] Judicial review is limited to the Commissioner's final decision, which is generally the ALJ's decision. *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1155 n.1 (D.N.M. 2016).  "This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision." *Id.*

uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## B.      Disability Determination Process

A person must be "under a disability" to qualify for disability insurance benefits under Title II. 42 U.S.C. § 423(a)(1)(E). Similarly, a "disabled" person may qualify for supplemental security income benefits under Title XVI. 42 U.S.C. § 1382a(1). An individual is considered to be "under a disability" if she is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

The Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies the statutory criteria:

(1)      At step one, the ALJ must determine whether the claimant is engaging in "substantial gainful activity."[3] If the claimant is engaging in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)      At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment (or combination of impairments) that is severe and meets the duration requirement, she is not disabled.

(3)      At step three, the ALJ must determine whether a claimant's impairment meets or equals in severity one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meets the duration requirement. If so, a claimant is presumed disabled.

(4)      If none of the claimant's impairments meet or equal one of the listings, the ALJ must determine at step four whether the claimant can perform her "past relevant work." This step involves three phases. *Winfrey v. Chater*, 92 F.3d

---

[3] "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). "[W]ork may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.* "Gainful work activity is work activity that you do for pay or profit." 20 C.F.R. §§ 404.1572(b), 416.972(b).

1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. Third, the ALJ must determine whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is able to perform her past relevant work is not disabled.

(5)    If the claimant is unable to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan*, 399 F.3d at 1261. The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing other work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II. <u>Background and Procedural History</u>

### A. Factual Background

Ms. Egan alleges that she became disabled on January 6, 2014 at fifty-eight years of age due to cervical spondylosis, degeneration of lumbar intervertebral discs, asthma, and thyroid

problems. (AR 78, 90.[4]) Previously, Ms. Egan was an information technology ("IT") professional who did government contract work. (AR 36-38, 84, 244, 260, 266-73.)

Ms. Egan moved from California to Virginia in or about 2004. (AR 36-37, 377, 425-37.) She had a cervical MRI at the Virginia Hospital Center on July 5, 2005. (AR 774-75.) Neurosurgeon Charles Riedel, M.D., ordered the MRI, which documented "[m]oderately severe spondylotic changes of the cervical spine" and "[m]oderate canal stenosis at C5-C6 with signal abnormality in the cord which could indicate edema versus myelomalacia." (*Id.*) Dr. Riedel performed a cervical discectomy with C5-C6 fusion on Ms. Egan in 2006. (AR 444, 571.) Ms. Egan had another cervical MRI in December 2010.[5] (AR 449-50.)

Ms. Egan saw her primary care physician, Kathryn Dreger, M.D., four times in late 2013 for a comprehensive medical examination and follow-up appointments for hypothyroidism and migraines. (AR 361-62, 366-67, 370-71, 376-77.) At none of these appointments did Ms. Egan complain of back or neck pain; and, at her November 11, 2013 comprehensive medical examination, Dr. Dreger noted that Ms. Egan's "neck has been 'doing great,'" and that there was "[n]o misalignment, asymmetry, crepitation, defects, tenderness, masses, effusions, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis or extremities." (AR 377-78.)

On January 6, 2014, Dr. Riedel saw Ms. Egan and noted that she had "hurt herself" two days earlier by putting on a "heavy army pack." (AR 444.) In addition to chronic weakness in her left arm, Dr. Riedel noted that Ms. Egan had developed acute lower back pain with sciatica and

---

[4] Citations to "AR" are to the transcript of the administrative record filed in this matter on September 4, 2018. (Doc. 13.)

[5] The record does not include the results of Ms. Egan's December 2010 cervical MRI; however, radiologist Claude Raphael, M.D., used it as a basis of comparison in interpreting the cervical MRI Ms. Egan had in January 2014. (AR 449-50.)

had been to the emergency room, where she was given muscle relaxants and analgesics.[6]  (*Id.*)  Dr. Riedel ordered cervical and lumbar MRIs, a nerve conduction study and electromyography ("EMG"), and physical therapy.  (AR 444-50.)  The cervical and lumbar MRIs were performed at the Virginia Hospital Center on January 17, 2014, and the nerve conduction study and EMG at Northern Virginia Neurologic Associates on June 20, 2014.  (AR 445-50.)  In addition, Ms. Egan attended about nineteen physical therapy appointments with Thomas Daly, P.T., between January 22 and June 25, 2014.[7]  (AR 493-519, 636-40.)  Ms. Egan also had follow-up appointments with Dr. Riedel on March 17, May 22, and July 15, 2014.  (AR 441-43.)  On May 22, 2014, Dr. Riedel noted that physical therapy had been "very helpful" regarding Ms. Egan's lower back pain, but that the pain in her interscapular area and numbness in her hands was "not responding as well to her therapy."  (AR 442-43.)  On July 15, 2014, based on Ms. Egan's history, physical examinations, and test results, Dr. Riedel diagnosed Ms. Egan with cervical stenosis C3-C4, C4-C5, and C6-C7 status post prior C5-C6 fusion, chronic left C6 radiculopathy, and lumbar degenerative disc disease and spondylosis with scoliosis, as well as carpal tunnel syndrome.  (AR 441.)

Dr. Dreger saw Ms. Egan four times during the first half of 2014 as well.  (AR 347-57.)  Specifically, on January 31, 2014, Dr. Dreger recorded that Ms. Egan had injured herself by bending backwards while lifting weights at a hotel and reported "much anterior pain."  (AR 356.)  On February 14, 2014, she noted that physical therapy was helping and that Ms. Egan reported bad days and good days.  (AR 353.)  On March 27, 2014, Dr. Dreger indicated that Ms. Egan did not

---

[6] In light of the uncontroverted medical evidence that picking up a heavy army pack injured Ms. Egan, the ALJ erred in concluding that Ms. Egan's picking up the pack was "inconsistent with her allegations that she is unable to lift anything more than ten pounds."  (AR 21.)

[7] Ms. Egan participated in physical therapy with Mr. Daly twice in January, four times in February, six times in March, four times in April, twice in May, and once in June 2014.  (AR 493-519, 636-40.)

want injections and did not need surgery but was using a cane to walk, still having pain in her hip, leg, hands, and arms, and taking Vicodin[8] for pain. (AR 350.) She also noted that Ms. Egan had difficulty getting onto the exam table at this appointment. (AR 351.) Finally, on June 27, 2014, Dr. Dreger recorded that Ms. Egan was attending physical therapy, seeing Dr. Riedel, and "doing 'real well.'" (AR 347.)

Ms. Egan made an unsuccessful attempt to return to work after January 6, 2014 but then filed for short-term disability benefits from private insurer UNUM on February 20, 2014. (AR 251, 782-83.) Her short-term disability benefits were ultimately converted to long-term disability benefits, and she never returned to work. (AR 38-39, 331.) She moved to New Mexico in October 2014 to be near her mother and sister. (AR 62, 274.)

Ms. Egan completed two adult function reports, on November 20, 2014 and June 12, 2015. (AR 277-84, 294-301.) On November 20, 2014, Ms. Egan indicated, *inter alia*, that she had no problems with personal care, that she microwaved frozen dinners for meals, that a family member did her household chores, driving, and shopping because she was unable to do so, and that she used a cane and a neck brace. (AR 277-84.) On June 12, 2015, Ms. Egan indicated, *inter alia*, that she had difficulty dressing with buttons, doing her hair, shaving, and driving, that she prepared microwaved frozen dinners and sandwiches for meals, that she cleaned up after meals, cleaned house, vacuumed, dusted, mopped, and did laundry and yard work, that she walked, drove, and was able to go out alone, that she shopped for groceries in a store every other weekend, that she sometimes did Pilates, and that she used a cane and neck/back brace. (AR 294-301.) On both dates, she indicated that she lived alone and did not take care of anyone else. (AR 277-78, 294-95.)

---

8    Vicodin (hydrocodone and acetaminophen) is used to relieve moderate-to-severe pain. https://medlineplus.gov/druginfo/meds/a601006.html (last visited May 17, 2019).

On September 16, 2015, Ms. Egan established with primary care physician Rosa Galvez, M.D., at Lovelace Medical Group in Albuquerque.  (AR 720-24.)  At this appointment, *inter alia*, Ms. Egan reported fluctuating back pain and severe, worsened neck pain.  (AR 720.)  Dr. Galvez referred Ms. Egan for physical therapy and to neurosurgeon Andrew Metzger, M.D.,[9] and prescribed Vicodin, rizatriptan,[10] and levothyroxine.[11]  (AR 723.)  Dr. Galvez saw Ms. Egan on five more occasions:  October 19 and December 22, 2015, and January 25, February 22, and March 31, 2016.  (AR 667-719.)  On October 19, 2015, Dr. Galvez added gabapentin[12] to Ms. Egan's prescriptions.  (AR 713-19.)  On December 22, 2015, Ms. Egan reported that her lower back and neck pain were worsening.  (AR 688-94.)  Dr. Galvez noted improvement of symptoms with physical therapy and that Ms. Egan had elected to continue exercises at home.  (AR 694.)  On January 25, 2016, Ms. Egan reported severe upper, middle, and lower back pain with numbness; and, Dr. Galvez added Lisinopril[13] to Ms. Egan's prescriptions.  (AR 682-83, 686.)  On February 22, 2016, Dr. Galvez noted that Ms. Egan's back pain was "stable and well controlled."  (AR 680-81.)  On March 31, 2016, Ms. Egan reported moderate bilateral hand and toe numbness, worsened neck and lower back pain, and bilateral arm weakness and numbness.  (AR 667-71.)  According to Dr. Galvez, at this appointment Ms. Egan did not feel injections were warranted and requested a referral to a pain management specialist, which Dr. Galvez provided.  (*Id.*)  Ms. Egan also had

---

[9] On an undated Social Security form regarding her "Recent Medical Treatment," Ms. Egan wrote that Dr. Metzger was "not able to take me with Medicaid for surgery."  (AR 333.)

[10] Rizatriptan is used to treat the symptoms of migraine headaches. https://medlineplus.gov/druginfo/meds/a601109.html (last visited May 17, 2019).

[11] Levothyroxine is used to treat hypothyroidism.  https://medlineplus.gov/druginfo/meds/a682461.html (last visited May 18, 2019.)

[12] Gabapentin is used, *inter alia*, to relieve the pain of postherpetic neuralgia. https://medlineplus.gov/druginfo/meds/a694007.html (last visited May 17, 2019).

[13] Lisinopril is used alone or in combination with other medications to treat high blood pressure. https://medlineplus.gov/druginfo/meds/a692051.html (last visited May 17, 2019).

an appointment with Dr. Galvez on September 12, 2016 but left without being seen. (AR 663-65.)

Ms. Egan began attending physical therapy with Charlie Abadie, P.T., at Lovelace Rehabilitation Hospital on September 25, 2015. (AR 730-34.) On that date, Mr. Abadie noted that Ms. Egan was independent in her daily living activities including self-care, cooking, cleaning, driving, and community outings. (AR 731.) He also noted that she sometimes wore a neck collar at home and occasionally used a cane. (*Id.*) He further stated that, "[d]espite her lengthy history of issues and moderate-to-severe nature of pain issues from time to time, this patient performs quite well during evaluation." (AR 734.) More specifically, he observed that Ms. Egan had slightly flat back and forward head posture, somewhat limited range of motion for cervical extension and lower back flexion, slight tenderness or tightness at the lower back, some tightness chiefly into neck extension and lower back flexion, and otherwise normal examination findings. (AR 731-33.)

Ms. Egan participated in physical therapy with Mr. Abadie on September 29, 2015 and October 13, 2015. (AR 739, 741). She canceled her appointments on October 7, 2015 and October 20, 2015, on the latter date reporting that she was "in too much pain." (AR 740, 742.) She arrived late for her appointment on October 30, 2015, and although Mr. Abadie was not able to treat her, he did speak with her for about twenty minutes. (AR 743.) On this occasion, Mr. Abadie advised Ms. Egan that she did not necessarily need to make up the visits she had missed as long as she started to focus on herself when doing her home exercises. (AR 743.) Mr. Abadie discharged Ms. Egan on November 16, 2015 for nonattendance. (AR 744.)

Gerald Blazek, M.D., saw Ms. Egan twice for pain management, on November 2, 2016 and December 7, 2016. (AR 756-61, 768-72.) On examination at both appointments, he noted

decreased strength and sensation in Ms. Egan's arms, hands, and ankles. (*Id.*) He further noted that Ms. Egan had no interest in blocks for her pain, wished to continue with gabapentin and hydrocodone for pain management, and agreed to abide by a narcotic agreement. (AR 758.) At her first appointment with Dr. Blazek, test results indicated and Ms. Egan confirmed that she also smoked marijuana for pain relief. (*Id.*)

At the January 26, 2017 hearing before the ALJ, Ms. Egan testified that she was living with her mother and engaging in minimal daily living activities, including preparing simple meals, reading, watching television, getting medication for herself and her mother, and providing her mother with companionship. (AR 35, 42-44.) According to Ms. Egan's testimony, the following conditions prevent her from working: numbness in her hands and arms, which prevents her from typing, writing, buttoning clothes, grasping, handling, and fingering; back pain and numbness in her legs when she sits; limited range of motion in her arms; lack of concentration and disrupted sleep; and, migraine headaches. (AR 45-51, 58-59, 63.) Ms. Egan further testified that, on a good day, her pain with medication is between 7 and 8 on a 10-point scale. (AR 63-64.)

The record includes the following medical opinion evidence. On February 19, April 14, April 25, June 11, and August 6, 2014, Dr. Riedel completed forms in support of the short- and long-term disability claims Ms. Egan filed with UNUM. (AR 475-77, 480-81, 522-23, 629-30, 782-83.) Dr. Riedel expressed opinions regarding Ms. Egan's functional restrictions and limitations on these forms. (*Id.*) In addition, Dr. Riedel completed a form for the Virginia Employment Commission on August 4, 2014, on which he opined about Ms. Egan's ability to work. (AR 190.)

On March 17, 2014, Mr. Daly completed a form for UNUM in support of Ms. Egan's short-term disability claim, in which he expressed an opinion about Ms. Egan's functional restrictions and limitations. (AR 454-55.)

On February 21, 2015, state agency consultative examiner Roxanna Phillips, M.D., reported that she was "[u]nable to determine" Ms. Egan's functional limitations because she was "unsure of the validity of [Ms. Egan's] responses."[14] (AR 652, 657.)

On March 11, 2015, non-examining medical consultant Robert Redd, M.D., opined regarding Ms. Egan's RFC at initial consideration; and, on June 10, 2015, non-examining medical consultant S. Williams, M.D., opined regarding Ms. Egan's RFC at reconsideration. (AR 86-87, 110-11.)

Finally, in an undated, hand-written note with no supporting documentation, Basil Abramowitz, M.D., expressed an opinion regarding Ms. Egan's functional restrictions and limitations. (AR 659.)

B.     **Procedural History**

On August 11, 2014, Ms. Egan protectively filed applications for disability insurance benefits under Title II, and supplemental security income benefits under Title XVI, of the Social Security Act, alleging an onset date of January 6, 2014. 42 U.S.C. §§ 401 *et seq.*; 42 U.S.C. §§ 1381 *et seq.*; (AR 12, 76-77, 90, 96, 102, 114.) The agency denied Ms. Egan's applications at the initial level and upon reconsideration on March 11, 2015 and June 23, 2015, respectively. (AR 76-77, 126-27.) On August 13, 2015, Ms. Egan requested a hearing before an ALJ. (AR 141.) ALJ

---

[14] In her report regarding her February 21, 2015 examination of Ms. Egan, Dr. Phillips wrote that Ms. Egan was "intentionally intimidating" and "was seen" in the parking lot after the examination "walking easily, swinging her cane, searching in [a] large handbag for keys, twisting [her] back and neck to look around and was able to drive herself." (AR 657.) The ALJ gave Dr. Phillips' opinion "little weight," noting internal inconsistencies such as her finding that Ms. Egan had bilateral "normal grip strength," but also noting bilateral grip strength of 2/5, where 5 is normal. (AR 656.) Ms. Egan's counsel asked the ALJ to subpoena Dr. Phillips to testify at a hearing, but the ALJ denied this request. (AR 12.)

Michael Leppala conducted a hearing on January 26, 2017. (AR 29-75.) Ms. Egan appeared in person at the hearing with attorney representative Michael Armstrong. (*Id*.) The ALJ took testimony from Ms. Egan and from impartial vocational expert ("VE") Valerie Rodriguez. (*Id.*) On May 3, 2017, the ALJ issued a decision finding Ms. Egan not disabled. (AR 9-23.) The Appeals Council upheld the ALJ's final decision on April 25, 2018, making the ALJ's decision the final decision of the Commissioner. (AR 1-3.) This appeal followed.

## C.      The ALJ's Decision

In his May 3, 2017 decision, ALJ Leppala determined at step one of the sequential evaluation process that Ms. Egan had not engaged in substantial gainful activity after her alleged onset date. (AR 14.) At step two, the ALJ found that Ms. Egan has the severe impairments of: (1) spine disorders; and, (2) carpal tunnel syndrome. (*Id.*) The ALJ further found that all of Ms. Egan's other impairments, including obstructive sleep apnea and hypertension, are nonsevere.[15] (AR 15.)

The ALJ determined at step three that Ms. Egan's impairments do not meet or medically equal the severity of one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (*Id.*) As a result, the ALJ proceeded to step four and found that Ms. Egan has the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (AR 16.) Also at step four, the ALJ concluded that Ms. Egan could perform her past relevant work as an Acquisition Officer (DOT 162.117-018), which is classified as light work, or as an IT Consultant (DOT 032-262-010), which is classified as sedentary work. (AR 22.) The ALJ therefore

---

[15] The ALJ did not specifically mention Ms. Egan's impairments of asthma and thyroid problems. (AR 15.) In addition, Ms. Egan has not alleged, and the record does not reflect, that she has the impairment of obstructive sleep apnea. However, Ms. Egan does not challenge the ALJ's apparent errors regarding the nature of her nonsevere impairments in her Motion.

concluded that Ms. Egan was not disabled at any time from January 6, 2014 through the date of his decision.[16]  (AR 22-23.)

### III. <u>Analysis</u>

In support of her Motion, Ms. Egan argues that:  (1) the ALJ erred by improperly weighing the opinions of Dr. Riedel, her treating neurosurgeon, in violation of SSR 96-2p; and, (2) the ALJ's formulation of Ms. Egan's RFC was not based on substantial evidence because he failed to account for her subjective allegations of pain and other symptoms. (Doc. 19 at 1, 26.)  For the reasons discussed below, the Court finds that the ALJ did not provide adequate reasons for the weight he gave to Dr. Riedel's opinions.  The Court further concludes that this error was not harmless and therefore requires remand.  The Court will not address Ms. Egan's remaining claim of error because it may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

**A.     The ALJ did not provide adequate reasons for the weight he gave to Dr. Riedel's opinions.**

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."[17]  *Hamlin*, 365 F.3d at 1215 (citation omitted).

> A physician's opinion is deemed entitled to special weight as that of a "treating source" when he has seen the claimant a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment, taking into consideration the treatment the source has provided and the kinds and extent of

---

[16] Because the ALJ concluded that Ms. Egan was not disabled at step four, he did not proceed to step five of the sequential evaluation process.  *Casias*, 933 F.2d at 801; 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[17] The agency has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *compare* 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017"), *with* 20 C.F.R. § 404.1520c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017").  However, because Ms. Egan filed her claims in 2014, the previous regulations still apply to this matter.  (AR 76-77.)

examinations and testing the source has performed or ordered from specialists and
independent laboratories.

*Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) (quotation marks and brackets omitted).

When the opinion at issue is that of a treating source, the ALJ must first consider "whether the
opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques
and is consistent with the other substantial evidence in the record." *Allman v. Colvin*, 813 F.3d
1326, 1331–32 (10th Cir. 2016) (quoting *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir.
2007)). "If so, the ALJ must give the opinion controlling weight." *Id.*

Moreover, even if a treating physician's medical opinion is not entitled to controlling
weight, it is "still entitled to deference" and the ALJ must decide what weight, if any, to give it.
*Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Robinson v. Barnhart*, 366 F.3d 1078,
1082 (10th Cir. 2004). Relevant factors the ALJ should consider are:

> (1) the length of the treatment relationship and the frequency of examination; (2)
> the nature and extent of the treatment relationship, including the treatment provided
> and the kind of examination or testing performed; (3) the degree to which the
> physician's opinion is supported by relevant evidence; (4) consistency between the
> opinion and the record as a whole; (5) whether or not the physician is a specialist
> in the area upon which an opinion is rendered; and (6) other factors brought to the
> ALJ's attention which tend to support or contradict the opinion.

*Allman*, 813 F.3d at 1331-32; *Oldham*, 509 F.3d at 1258; *Robinson*, 366 F.3d at 1082; *Watkins,*
350 F.3d at 1301.

Although he need not specifically address each of the above factors, "an ALJ must give
good reasons . . . for the weight assigned to a treating physician's opinion." *Allman*, 813 F.3d at
1332; *Oldham*, 509 F.3d at 1258; *Langley,* 373 F.3d at 1119. These reasons must be "sufficiently
specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating
source's medical opinion and the reason for that weight." *Allman*, 813 F.3d at 1332; *Oldham*, 509
F.3d at 1258; *Langley*, 373 F.3d at 1119. Moreover, "[i]f the ALJ rejects the opinion completely,

he must then give specific, legitimate reasons for doing so." *Allman*, 813 F.3d at 1332; *Langley*, 373 F.3d at 1119.

> In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.

*Langley*, 373 F.3d at 1121 (emphasis omitted) (quoting *McGoffin v. Barnhart,* 288 F.3d 1248, 1252 (10th Cir. 2002)); *Robinson*, 366 F.3d at 1082 (same).

In addition,

> when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around. The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[18]

*Hamlin*, 365 F.3d at 1215 (citations and quotation marks omitted); *Robinson*, 366 F.3d at 1084 (same).

In his decision, ALJ Leppala did not address whether Dr. Riedel was a treating source. (AR 17-19.) However, on appeal, the Commissioner does not dispute Ms. Egan's contention that Dr. Riedel was Ms. Egan's treating neurosurgeon from at least January 2005 to July 2014. (Doc. 21 at 18-22; *see* AR 441-44, 782.) As further described below, Dr. Riedel completed five (5) forms in support of Ms. Egan's applications for short- and long-term disability benefits from UNUM, on February 19, 2014 (AR 782-83), April 14, 2014 (AR 475-77), April 25, 2014 (AR 480-81), June 11, 2014 (AR 522-23), and August 6, 2014 (AR 629-30).[19] In addition, on August 4,

---

[18] "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson*, 366 F.3d at 1084.

[19] These documents are not, as the ALJ indicated, "workers compensation forms," but rather form letters regarding Ms. Egan's claims for private insurance disability benefits. (AR 18.) In addition, the ALJ mistakenly attributed to

2014, he completed a form for the Virginia Employment Commission regarding Ms. Egan's ability to work. (AR 190.)

On February 19, 2014, Dr. Riedel completed a "Short Term Disability Claim Form" for UNUM indicating that he had advised Ms. Egan to stop working on January 6, 2014 and had not advised her to return to work. (AR 782-83.) On the basis of "[p]rogressed cervical stenosis C3/4 and C4/5" and "multilevel lumbar d[egenerative] d[isc] d[isease] L3/L4," he opined that Ms. Egan was subject to the following restrictions and limitations: "no lifting more than 10 [pounds], no overhead lifting and reaching, no bending, no twisting, no climbing, avoid activities that present risk of fall." (AR 783.) Dr. Riedel further indicated that Ms. Egan's "[e]xpected return to work date" was "approx[imately]" April 21, 2014. (*Id.*)

On April 14, 2014, Dr. Riedel completed a form letter from UNUM regarding Ms. Egan's disability benefits. (AR 475-77.) On this form letter, Dr. Riedel indicated that, "[d]uring an 8-hour workday," Ms. Egan could sit, stand, and walk no more than half an hour at a time, could lift, carry, push, and pull ten pounds occasionally, could perform no overhead work, could not bend, stoop, squat, climb, or crawl, and could drive frequently. (*Id.*) Dr. Riedel further indicated that these restrictions and limitations would be applicable "[p]robably until June 2014," and that Ms. Egan could return to work "[p]robably in June 2014." (AR 476.)

Dr. Riedel completed a different form letter from UNUM regarding Ms. Egan's short-term disability benefits on April 25, 2014.[20] (AR 480-81.) On this form letter, Dr. Riedel indicated that

Dr. Riedel the March 17, 2014 form letter that Mr. Daly, Ms. Egan's physical therapist, completed. (AR 454-455.) On this form letter, Mr. Daly indicated that Ms. Egan could not lift objects greater than or equal to 10 pounds or sit or stand for periods greater than or equal to 30 minutes. (AR 455.) He further indicated that she should not forward bend, drive for periods greater than or equal to 30 minutes, or engage in strenuous exercise or running. (*Id.*) Mr. Daly indicated a "Begin Date" of March 17, 2014, and an "End Date" of April 17, 2014, for these restrictions and limitations. (*Id.*)

[20] In his decision, the ALJ indicated that Dr. Riedel completed this form letter on April 28, 2014. (AR 18.)

Ms. Egan had the following restrictions and limitations: "no lifting more than 10 [pounds], no bending, no twisting, no crawling, no climbing, no squatting." (AR 481.) Dr. Riedel further indicated a "Begin Date" of January 6, 2014, and an "End Date" of "approximately" June 2014 for these restrictions and limitations. (*Id.*)

On June 11, 2014, Dr. Riedel completed a form letter from UNUM similar to the letter he completed on April 25, 2014, except that this letter concerned Ms. Egan's claim for long-term disability benefits. (AR 522-23.) On this form letter, Dr. Riedel indicated the same restrictions and limitations as in his April 25, 2014 opinion, *i.e.*, "no lifting more than 10 [pounds], no bending, no twisting, no crawling, no climbing, no squatting." (AR 523.) He also indicated the same "Begin Date," *i.e.*, January 6, 2014, but a different "End Date," *i.e.*, the "[p]resent," for these restrictions and limitations. (*Id.*)

On August 4, 2014, Dr. Riedel completed a Request for Physician's Certificate of Health from the Virginia Employment Commission pursuant to Ms. Egan's application for unspecified benefits. (AR 190.) On this form, Dr. Riedel indicated that Ms. Egan was "totally unable to work" from January 6, 2014 to the "[p]resent," that she was not able to perform any work, and that Dr. Riedel was "unable to determine" the earliest date Ms. Egan would be able to work again. (*Id.*)

Finally, on August 6, 2014, Dr. Riedel completed another form letter from UNUM, similar to the form letters he completed on April 25 and June 11, 2014. (AR 629-30.) On this form letter, Dr. Riedel indicated the same restrictions and limitations as in his April 25 and June 11, 2014 opinions, *i.e.*, "no lifting more than 10 [pounds], no bending, no twisting, no crawling, no climbing, no squatting." (AR 630.) As on the June 11, 2014 form letter, Dr. Riedel indicated a "Begin Date" of January 6, 2014 and an "End Date" of the "[p]resent" for these restrictions and limitations. (*Id.*)

The ALJ stated that he gave "some weight" to Dr. Riedel's February through June 2014 opinions.[21] (AR 18.) The ALJ explained that he did not give more weight to these opinions for three reasons. (*Id.*) First, he stated that the opinions were "temporary" and "expire[d] at the end of the duration documented on the opinion[s]." (*Id.*) Second, he stated that they were "inconsistent with Dr. Riedel['s] documented notes in the medical records." (*Id.*) Finally, he indicated that the opinions were "conclusory because the doctor does not adequately explain the reasons for the limitations in the opinion[s]." (*Id.*) The ALJ did not discuss or assign a weight to Dr. Riedel's August 2014 opinions. (*Id.*)

As an initial matter, the ALJ failed to indicate whether he found Dr. Riedel to be a treating source whose opinions are entitled to special weight within the meaning of the treating physician rule. *Doyal*, 331 F.3d at 763; (AR 17-19.) This failure is error because it does not "provide [the] court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen*, 436 F.3d at 1165. Further, with respect to Dr. Riedel's February through June 2014 opinions, the ALJ failed to follow the treating physician rule because he did not discuss whether the opinions were entitled to controlling weight. Instead, he "collapsed the two-step inquiry into a single point, stating only" the weight he gave the opinions and the reasons why. *Chrismon v. Colvin*, 531 F. App'x 893, 901 (10th Cir. 2013).[22] However, the Tenth Circuit has declined to reverse on this ground where "the ALJ implicitly declined to give . . . controlling weight" to a treating source's opinion. *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014). Accordingly, the

---

[21] The ALJ included Mr. Daly's March 17, 2014 opinion in the group of opinions he attributed to Dr. Riedel and to which he gave some weight. (AR 18.)

[22] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

Court will review the reasons the ALJ provided for the weight he assigned to Dr. Riedel's opinions. *See Langley*, 373 F.3d at 1120-23; *Chrismon*, 531 F. App'x at 901.

The Court finds that the ALJ did not provide adequate reasons for reducing the weight he gave to Dr. Riedel's February through June 2014 opinions. As to the ALJ's first proffered reason, substantial evidence does not support his conclusion that the February through June 2014 opinions were temporary and expired at the end of the duration documented on the opinions. (AR 18.) In none of these opinions did Dr. Riedel opine that Ms. Egan's restrictions and limitations would end on a date certain. Rather, on the February 2014 form, Dr. Riedel indicated an *approximate* date for an *expected* return to work, (AR 783); on the April 14, 2014 form letter, he indicated a *probable* month until which the restrictions and limitations would be applicable, (AR 476); and, on the April 25, 2014 form letter, he indicated an *approximate* "End Date" for the restrictions and limitations. (AR 481.)

Even less definite is the termination date for the restrictions and limitations Dr. Riedel included in the June 2014 form letter regarding Ms. Egan's long-term disability claim, on which Dr. Riedel indicated an open-ended "End Date" of the "[p]resent." (AR 523.) Particularly when read in conjunction with Dr. Riedel's August 6, 2014 opinion, which indicated restrictions and limitations identical to those in the June 11, 2014 opinion and also indicated an "End Date" of the "[p]resent," (AR 630), it is clear that Dr. Riedel used the term "present" to indicate ongoing restrictions and limitations, and not their immediate expiration. Nor does the record contain any other evidence to support the ALJ's characterization of the February through June 2014 opinions as temporary and expired. On the contrary, the January 2014 MRIs Dr. Riedel ordered showed that Ms. Egan had chronic and progressive spinal abnormalities; and, at his last appointment with

her on July 15, 2014, Dr. Riedel continued to diagnose Ms. Egan with spinal disorders and to note chronic symptoms associated with these disorders.  (AR 441, 447-50.)

Moreover, to the extent the ALJ was unsure whether Dr. Riedel's February through June 2014 opinions expired on a date certain, the ALJ at least had a duty to develop the record on this point.   "[A] social security disability hearing is nonadversarial, and thus the ALJ bears responsibility for ensuring that an adequate record is developed during the disability hearing consistent with the issues raised in that hearing." *Grogan*, 399 F.3d at 1264 (quotation marks omitted).  Thus, "when the ALJ considers an issue that is apparent from the record, he has a duty of inquiry and factual development with respect to that issue." *Maes*, 522 F.3d at 1097.  In particular, an ALJ "generally must recontact the claimant's medical sources for additional information when the record evidence is inadequate to determine whether the claimant is disabled." *Id.*  Here, there is no indication in the record that the ALJ recontacted Dr. Riedel to clarify the intended duration of his medical opinions.

Substantial evidence also does not support the ALJ's second proffered reason for reducing the weight he gave to Dr. Riedel's February through June 2014 opinions, *i.e.*, that they are "inconsistent with Dr. Riedel['s] documented notes in the medical records." (AR 18.)  The ALJ failed to identify or describe any inconsistencies between Dr. Riedel's opinions and his treatment notes, and a meticulous review of the record reveals none.  The record contains treatment notes indicating that Dr. Riedel saw Ms. Egan on January 6, March 17, May 22, and July 15, 2014.  (AR 441-44.)  On January 6, 2014,[23] Dr. Riedel indicated that Ms. Egan had hurt herself two days previously and had gone to the emergency room.  (AR 444.)  Based on Ms. Egan's history and

---

[23] Dr. Riedel's treatment note indicates that this visit took place on January 6, 2013; however, the content and the copy forwarded to Ms. Egan's primary care physician confirm that the visit actually took place on January 6, 2014. (*Compare* AR 397 *with* AR 444.)

physical examination, Dr. Riedel diagnosed her with "[p]robable left L5 radiculopathy due to lumbar degenerative disc disease and spondylosis," and "[s]tatus post previous C5-6 fusion with multilevel cervical spondylosis and stenosis." (*Id.*) Dr. Riedel noted that Ms. Egan had received muscle relaxants and analgesics at the emergency room and referred her for physical therapy. (*Id.*)

Dr. Riedel also ordered MRIs of Ms. Egan's cervical and lumbar spine, which were performed on January 17, 2014. (AR 447-50.) According to radiologist Claude Raphael, M.D., the MRI of Ms. Egan's cervical spine indicated

> [m]ultilevel degenerative disc disease with very prominent posterior margin disc osteophyte complex formation at numerous levels resulting in fairly severe bilateral neuroforaminal impingement. These changes have progressed since [December 2010]. . . . Note is made of moderate central canal stenosis at the C3-C4 and C4-C5 levels also increased slightly since prior. . . . [Three millimeter] retrolisthesis of C3 on C4. This is increased slightly since prior.

(AR 450.) Dr. Raphael further noted "moderate impression upon the ventral cord with cord flattening" with the central canal stenosis at C3-C4. (AR 449.)

> The MRI of Ms. Egan's lumbar spine indicated

> [d]extroconvex scoliosis with moderate reactive bone marrow edema along the concavity of the curvature at L3-L4. Facet arthropathy and multilevel degenerative listhesis and advanced degenerative disc disease throughout the lumbar spine. Findings result in . . . multilevel neural foraminal narrowing . . . . Multilevel narrowing [of] the central canal, mild to moderate at L3-L4.

(AR 448.) The "multilevel neural foraminal narrowing" included "severe left and moderate right neural foraminal narrowing" at L3-L4. (AR 447.)

Dr. Riedel also subsequently ordered a nerve conduction study and EMG, which Faye Rosenbaum, M.D., of Northern Virginia Neurologic Associates performed on June 20, 2014. (AR 445-46.) Dr. Rosenbaum noted that her findings were consistent with

a median neuropathy at the left wrist but the clinical significance of this finding is uncertain since the abnormal values are similar to the asymptomatic right side.[24] There is no electrophysiological evidence of coexisting cervical radiculopathy resulting in denervation in the left arm or left hand.

(AR 446.)

In July 2014, based on her history, physical examinations, and test results, Dr. Riedel diagnosed Ms. Egan with cervical stenosis C3-C4, C4-C5, and C6-C7 status post prior C5-C6 fusion, chronic left C6 radiculopathy, lumbar degenerative disc disease and spondylosis with scoliosis, and carpal tunnel syndrome. (AR 441.) He noted that she was "doing very well with physical therapy, which helps her a great deal," but that she was "still having some numbness," and "us[ing] a stick when she walks." (*Id.*) He further noted that she had "chronic weakness in the left biceps and brachioradialis," and diminished reflexes "at the biceps and brachioradialis." (*Id.*) However, he found that she had "not developed clinical myelopathy," and so was "not compelled to pursue surgery at this time." (*Id.*) He recommended that she watch for progressive signs and symptoms, complete her course of physical therapy over the next month, and follow up with him in six months. (*Id.*)

There is nothing in the foregoing records inconsistent with the restrictions and limitations to which Dr. Riedel opined. On the contrary, Dr. Riedel's treatment notes, as well as the results of the objective medical tests he ordered, appear consistent with the functional restrictions and limitations he indicated. To the extent that the ALJ believed that Dr. Riedel's July 15, 2014 treatment note was inconsistent with his opinions because it characterized Ms. Egan's cervical stenosis as "normal," (AR 18), this is clear error: nowhere does the treatment note in question (or

---

[24] Before Dr. Rosenbaum's study in June 2014, Ms. Egan had reported numbness in "her hands" to Dr. Riedel, (AR 442), "pain in hands and arms" to Dr. Dreger, (AR 350), and "symptoms to bilateral arms (left greater than right)," to Mr. Daly. (AR 504.) As such, it is unclear why Dr. Rosenbaum believed that Ms. Egan's right arm and hand were "asymptomatic." (AR 446.)

any other medical record) indicate that Ms. Egan's cervical stenosis at that time was normal or otherwise nonpathological. (AR 441.) Moreover, while the form letters Dr. Riedel completed do not indicate the reasons for his opinions, his treatment notes and the results of the medical tests he ordered clearly do. As such, the ALJ's third reason for reducing the weight he gave to Dr. Riedel's opinion, *i.e.*, that the form letters are conclusory, is also invalid.

The Court notes that the ALJ did not discuss or identify the weight he assigned to Dr. Riedel's August 2014 opinions at all. *Allman*, 813 F.3d at 1332; *Robinson*, 366 F.3d at 1082; *Watkins,* 350 F.3d at 1301. The Court further notes that the ALJ did not discuss the length and nature of Dr. Riedel's treatment relationship with Ms. Egan, or whether he was a specialist in the area on which his opinions were rendered. These omissions, and particularly the failure to discuss or assign any weight to Dr. Riedel's August 2014 opinions, are clear error. *See Allman*, 813 F.3d at 1332 ("[A]n ALJ must give good reasons ... for the weight assigned to a treating physician's opinion."); *Watkins*, 350 F.3d at 1301 ("[W]e cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion.").

In defense of the reduced weight the ALJ gave to Dr. Riedel's February through June 2014 opinions, the Commissioner observes that Dr. Riedel expressed his opinions in form letters, citing *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987), for the proposition that "check-the-box" forms are not substantial evidence. (Doc. 21 at 20.) However, to the extent the ALJ reduced the weight he gave Dr. Riedel's opinions based on their format, it was error for him to do so. As the Tenth Circuit has noted, *Frey*

> dealt with a nontreating physician's checkmarks on the agency's RFC form based on the most limited sort of contact and examination. There was no indication of careful study of the claimant's history or prior examinations; the report even misstates the claimant's name.

*Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (quotation marks and brackets omitted).

Here, in contrast, the record includes not only Dr. Riedel's six assessments of Ms. Egan's functional restrictions and limitations, but also reports regarding his evaluation and treatment of Ms. Egan over many years, including notes and results from four visits, two MRIs, and a nerve conduction study and EMG in the first half of 2014, as well results from an MRI in 2005. (AR 441-50, 774-75.) Thus, the record indicates that Dr. Riedel had extensive contact with Ms. Egan and ample information regarding her impairments when he assessed Ms. Egan's functional restrictions and limitations; and, the format he used to express his opinions cannot justify the reduced weight the ALJ gave them. *Carpenter*, 537 F.3d at 1267; *see also Andersen v. Astrue*, 319 F. App'x 712, 723 (10th Cir. 2009) (declining to "expand *Frey's* exclusion of check-box forms beyond those completed by nontreating physicians"). In sum, the Court finds that the ALJ erred by failing to provide adequate reasons for the weight he gave to Dr. Riedel's February through June 2014 opinions, and by failing to identify or discuss the weight he gave to Dr. Riedel's August 2014 opinions.

**B.     The ALJ's failure to properly consider Dr. Riedel's opinions in formulating Ms. Egan's RFC was harmful error.**

The Court further finds that the ALJ's failure to properly consider Dr. Riedel's opinions in formulating Ms. Egan's RFC was not harmless. The Tenth Circuit applies "harmless error analysis cautiously in the administrative review setting." *Fischer-Ross*, 431 F.3d at 733. Nevertheless, harmless error analysis may be appropriate where the Court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733-34. As explained below, in this case, a reasonable administrative factfinder following the correct analysis could have found that Ms. Egan had a more restrictive RFC resulting in a different finding at step four of the sequential evaluation process.

Initially, a reasonable administrative factfinder following the correct analysis could have given Dr. Riedel's opinions greater or controlling weight; and, these opinions, if given such weight, could have led the ALJ to find that Ms. Egan had a more restrictive RFC. For example, in the present matter, the ALJ found that Ms. Egan had the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (AR 16.) Light work, *inter alia*, "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). However, Dr. Riedel repeatedly opined that Ms. Egan should or could not lift more than ten pounds. (AR 475, 481, 523, 630, 783.) Had the ALJ given this opinion great or controlling weight, it would have prevented him from finding that Ms. Egan could perform the full range of light work.

The Commissioner argues that any error in weighing Dr. Riedel's opinions was harmless because a reasonable administrative factfinder would have found that Ms. Egan could still perform her past relevant work, even if he had found that she had a more restrictive RFC. (Doc. 21 at 11.) Specifically, the Commissioner argues, even if the ALJ had found that Ms. Egan had the RFC to perform only sedentary work, she could still perform her past relevant work as an IT Consultant, which is classified as sedentary. (*Id.*; *see* AR 22.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.

The Commissioner is correct that Dr. Riedel's restriction prohibiting Ms. Egan from lifting more than ten pounds would still allow her to perform sedentary work. However, the Commissioner ignores Dr. Riedel's August 4, 2014 opinion that Ms. Egan was unable to perform

*any* work and that he was unable to determine when she would be able to do so. (AR 190.) He also ignores Dr. Riedel's April 14, 2014 opinion, in which he indicated that Ms. Egan could sit, stand, and walk no more than half an hour at a time. (AR 475-77.) In light of these opinions, a reasonable administrative factfinder following the correct analysis could have concluded that Ms. Egan did not have the RFC to perform even her past relevant sedentary work. And again, if the ALJ required additional information from Dr. Riedel regarding the nature and extent of Ms. Egan's restrictions and limitations—such as, for example, the total amount of time during which he believed Ms. Egan could sit, stand, or walk during an eight-hour workday—the ALJ failed in his duty to develop the record by asking Dr. Riedel to provide that information. *Maes*, 522 F.3d at 1097; *Grogan*, 399 F.3d at 1264.

Three other errors in the ALJ's decision confirm that a reasonable administrative factfinder following the correct analysis could have found that Ms. Egan had an RFC that would prevent her from performing her past relevant work. First, substantial evidence does not support the ALJ's decision to give "significant weight" to the opinions of non-examining medical consultants Drs. Redd and Williams. Drs. Redd and Williams opined that Ms. Egan could lift or carry 50 pounds occasionally and 25 pounds frequently, and stand, walk, or sit for six hours in an eight-hour day, with no other limitations. (AR 98-99, 122-23.) In arriving at this determination, Drs. Redd and Williams expressly gave "[g]reat weight" to the February 2015 medical opinion evidence of Dr. Phillips.[25] (AR 99, 123.) Critically, however, the ALJ gave Dr. Phillips' opinion "little weight, as it is internally inconsistent." (AR 19.) For the ALJ to give little weight to the opinion of Dr.

---

[25] Drs. Redd and Williams incorporated several of Dr. Phillips' examination results in their assessments of Ms. Egan's RFC, and both of them made two separate remarks regarding Dr. Phillips' alleged observations of Ms. Egan's "[n]ormal cervical and lumbar function" in the parking lot after the examination. (AR 99, 123.)

Phillips, but significant weight to the opinions of Drs. Redd and Williams, who gave great weight to the opinion of Dr. Phillips, is wholly inconsistent and unsupported by substantial evidence.

Second, the ALJ gave "some weight" to Dr. Abramowitz's handwritten note as the opinion of a treating physician who "slightly underestimate[d]" Ms. Egan's limitations. (AR 21.) Dr. Abramowitz opined that Ms. Egan should not lift more than 50 pounds and should bend at the knees and avoid undue strain to the back, but in all other respects could participate fully and walk, run, and play non-contact sports as usual. (AR 659.) However, this note is undated, (*id.*), and there are no other documents in the record indicating if, when, how, or for how long Dr. Abramowitz treated Ms. Egan, or indeed if he ever even examined her. In addition, the note indicates that Dr. Abramowitz is located in San Diego; and, Ms. Egan moved away from California in or about 2004. (AR 36-37, 377, 425-37.) As such, no evidence at all supports the ALJ's decision to consider Dr. Abramowitz a treating physician, or to give any weight to a bare handwritten note that may well have pertained to Ms. Egan's functional restrictions and limitations ten years or more before the alleged onset of her disability.

Finally, the ALJ's characterization of Dr. Riedel's July 15, 2014 treatment note is not supported by substantial evidence. (AR 18.) According to the ALJ, in this note, Dr. Riedel opined that Ms. Egan was "doing well" and "does not need surgery," and diagnosed Ms. Egan with "*normal* cervical stenosis." (*Id.* (emphasis added).) In fact, the treatment note in question documents that Ms. Egan was "doing very well *with physical therapy*" but "still having some numbness" and other symptoms and was using "a stick" when she walked.[26] (AR 441 (emphasis added).) Regarding surgery, he indicated that Ms. Egan was "not compelled to pursue surgery" at

---

[26] In a different section of his decision, the ALJ stated that "there is no documented evidence of the Claimant using a cane in the record." (AR 22.) As Dr. Riedel's July 2014 treatment note shows, this statement is incorrect. (*See also, e.g.*, AR 350 (Dr. Dreger noted on March 27, 2014 that Ms. Egan was "using a cane now because dragging left hip/leg due to pain.").)

that time; and, he never stated or otherwise suggested that Ms. Egan's cervical stenosis was "normal." (*Id.*) Thus, the ALJ gave "considerable weight" to a misreading of Dr. Riedel's July 2014 treatment note.

In sum, the medical opinion evidence on which the ALJ relied to conclude that Ms. Egan could perform the full range of light work—Drs. Redd's and Williams' RFC assessments, Dr. Abramowitz's handwritten note, and Dr. Riedel's July 2014 treatment note—are either mischaracterized or not supported by substantial evidence in the record. As such, it was clearly harmful for the ALJ, in determining Ms. Egan's RFC, to fail to: (1) provide adequate reasons for the reduced weight he gave to Dr. Riedel's February through June 2014 opinions; (2) discuss or assign a weight to Dr. Riedel's August 2014 opinions; or, (3) further develop the record regarding any of Dr. Riedel's opinions. For these reasons, the Court will remand this matter to the Commissioner for rehearing.

**C.  The Commissioner need not assign this case to a different ALJ on remand.**

Finally, the Court must consider Ms. Egan's request that the Court remand this matter for rehearing before a different ALJ. (Doc. 19 at 26.) The Tenth Circuit has stated that it will direct assignment of a social security case to a different ALJ on remand "only in the most unusual and exceptional circumstances." *Miranda v. Barnhart*, 205 F. App'x 638, 644 (10th Cir. 2005) (quotation marks omitted). Moreover, the Seventh Circuit has held that courts "have no general power . . . to order that a case decided by an administrative agency be sent back . . . to a different [ALJ]," in the absence of sufficient evidence of bias to require review by a different ALJ as a matter of due process. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Here, Ms. Egan has not alleged or demonstrated sufficient evidence of bias to require review by a different ALJ as a matter of due process, nor does the Court find any other unusual or exceptional circumstances that

would require such a review. The Court therefore declines to direct the Commissioner to assign this case to a different ALJ on remand.

## IV. <u>Conclusion</u>

For the reasons stated above, IT IS HEREBY ORDERED that Ms. Egan's Motion to Reverse and Remand for a Rehearing with Supportive Memorandum (Doc. 19) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent